VERMONT LOAN & TRUST COMPANY, Plaintiff and Respondent,
v. H. L. WHITHED, Defendant and Appellant.

**Usurious Contract—Compensation for Procuring Loan—General Act—Constitutional Law—Uniform Operation—Building and Loan Associations.**

1. Section 4, c. 184, Laws 1890, provides that in all loan transactions the written contract shall correctly state the amount received by the borrower, and the rate of interest to be paid, and a failure so to do renders the contract usurious and void, except as otherwise in the chapter provided. Section 7 provides that a loan broker or other

person may receive a compensation for procuring a loan when such compensation, and the interest stated in the contract, together do not exceed 12 per cent. per annum in the aggregate. In a transaction where no middleman was employed, a note' was given for $575, due in five years, with 7 per cent. interest. The borrower received $500, and no more, $75 being by agreement retained for making the loan ; and the amount so retained, added to the 7·per cent., stated in the note, did not exceed 12 per cent. on $500 for·five years. *Held,* that if the transaction was usurious, under § 4, it was not saved by the provisions of § 7.

2. A public law of universal interest to the people of the state, and embracing all the citizens of the state, or all of a certain class or certain classes of citizens, and not limited to any particular locality, is a general, and not a special, law, as the term is used in the constitutional inhibition against special legislation.

3. A statute that grants no privileges or immunities, except such as would apply to all citizens under the circumstances and conditions expressed in the statute, does not violate the constitutional provision against granting special privileges and immunities.

4. The constitutional requirement that all laws of a general nature shall have a uniform operation is satisfied if the benefits and burdens of such law fall equally upon all members of the class or classes upon which it does operate.

5. The legislature has the right to classify persons or subjects for the purposes of legislation. Such classification must not be arbitrary, but must be based upon such differences in situation, condition, and purposes between the persons and things included in the class and those excluded therefrom as fairly and naturally suggest the propriety of, and necessity for, different or exclusive legislation in the line of the statute in which the classification appears.

6. The dealings of building and loan associations with their own stockholders differ from ordinary loan transactions to such an extent as to warrant the legislature in excepting such associations, as to such dealings, from the operation of the provisions of the general usury law.

7. In construing a particular section of a statute, it is the duty of the court to ascertain the intent of the legislature, and for that purpose it should consider the entire statute, and its general subject-matter, as well as all other statutes *in pari materia;* and, where the court is satisfied that adherence to the strict letter of the law would defeat the object and intent of the legislature, it is the duty of the court to regard the intent, even where to do so it is compelled to restrain the application of the letter.

(Opinion Filed July 14, 1891.)

*A*PPEAL from district court, Grand Forks county; Hon. CHARLES F. TEMPLETON, Judge.

*H. L. Whithed* (*Bangs & Fisk,* of counsel), for appellant. *Burke Corbett* (*Cy Wellington* and *Cochrane & Feetham,* of counsel), for respondent.

Action on promissory note for the purpose of testing the constitutionality of chapter 184, Laws of 1890, known as the "usury law." Judgment for plaintiff, holding the statute void under the state constitution. Defendant appeals. Reversed and district court directed to dismiss the action.

H. L. Whithed for appellant:

The contract in this case failed to express the exact amount of money to be received by the borrower. Having failed to do this, the section is indivisable, and it is made by the statute and so declared to be usury, which would make the contract nugatory and void, and respondent would be entitled to recover nothing. McGee v. Trotter, 1 Heisk 453. The authorities are numerous to the effect that usury, under whatever guise it will be cloaked, will be detected and ferreted out by the courts. It is also equally well recognized that a principal, as in this case, cannot, by way of a fee or compensation, take to exceed the rate of interest allowed by law. If § 11 of the act is unconstitutional it leaves the balance of the act operative and valid. Mathias v. Cromer, 40 N. W. Rep. 926. An unconstitutional provision or section in a statute will not affect the other provisions of the law, unless they are essentially and inseparably connected in substance. Cooley's Const. Lim. 177; Com. v. Hitchings, 5 Gray 485; People v. Briggs, 50 N. Y. 553. If the general provisions of the law are unobjectionable, the whole act will not be declared nugatory in consequence of some objectionable provisions. Smith v. Village of Adrian, 1 Mich. 495; Ames v. Booming Co., 6 M.l. 266; People v. Haug, 37 N. W. Rep. 21; Woolen v. State, 5 So. Rep. 39. The taking of premiums by building and loan associations is generally considered unobjectionable. Association v. Robinson, 69 Ala. 413; Winsted, etc., v. Ford, 27 Conn. 282; Id v. Rice, 27 Conn. 293; McLaughlin v.

Association, 62 Ind. 264; Hawkeye, etc., v. Blackburn, 48 Iowa 385; Merrill v. McIntyre, 13 Gray 157; Shannon v. Dunn, 43 N. H. 194; Hoboken v. Martin, 13 N. J. Eq. 427. Where the constitution provides that the legislature "shall pass no special law for any cause for which provision can be made by a general law" the Legislature is the sole judge as to whether provision by a general law is possible. State v. County Court, 50 Mo. 317, 11 Am. Rep. 415; State v. Hitchcock, 81 Am. Dec. 503.

Bangs & Fisk of counsel, for appellant:

Section 2 of article 1 of the state constitution requiring all laws of a general nature to have a uniform operation must be construed to mean that all laws of a general nature must operate equally upon all persons who are brought within the relations and circumstances provided for, though it may not affect every citizen of the state. 3 Am. & Eng. Ency. of Law, 697; McAunich v. Railroad Co., 20 Iowa 338; Railroad Co. v. Iowa, 94 U.S. 163; Cordova v. State, 6 Tex. App. 207; Sutherland on Stat. Con., § 125 and cases cited; Bumsted v. Govem, 47 N. J. Law 368; Id, 48 N. J. Law 612; State vs. Mining Co., 16 Nev. 432; Corwin v. Ward, 35 Cal. 198; Jackson v. Shawl, 29 Cal. 267; Merritt v. Boom Co., 25 N. W. Rep. 403; Ex Parte Smith, 38 Cal. 702; State v. Barker, 30 N. W. Rep. 267; People v. Henshaw, 18 Pac. Rep. 413. The word "operation" as used in said section refers to the practical working and effect of the law. Geebrick v. State, 5 Iowa 491. If a law acts equally and uniformly upon all parties upon whom it acts at all, it is not repugnant to the above constitutional provision. Corwin v. Ward, 35 Cal. 198. A law is general and uniform in its operation which operates equally upon all the subjects within the class of subjects for which it is adopted. Nichols v. Walter, 33 N. W. Rep. 800; Sutherland on Stat. Con., § 124. A general law is one which refers to persons and things as a class. Kilgore v. Magee, 85 Pa. St. 411; Wheeler v. Philadelphia, 77 Pa. St. 349; Walker v. Potter, 10 Ohio St. 85; McAunich v. Railroad Co., 20 Iowa 343; Barbier v. Connolly, 5 Sup. Ct. Rep. 357; Minn. Loan Co. v. Beebe, 41 N. W. Rep. 232. The law in question is not a special law. Holmes v. Smythe; 100 Ill. 413; Freeman v. Association, 114 Ill. 182;

Ex Parte Lichenstein, 7 Pac. Rep. 728; Winget v. Association, 21 N. E. Rep. 12; Chicago, etc., v. Iowa, 94 U. S. 155; State v. Berker, 30 N. W. Rep. 373; People v. Meyer, 3 West. 538. Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances. State v. Wilcox, 45 Mo. 458. The true practical limitation of the legislative power to classify is that the classification shall be upon some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggest the necessity or propriety of different legislation with respect to them. Cobb v. Bard, 42 N. W. Rep. 396; State v. Spaud, 34 N. W. Rep. 164; Sutherland on Stat. Con., § 127 and cases cited; Cooley Const. Lim. 481 *et seq.* A classification may be sustained where the differences are not extreme, but exist. The test would not then be judicial, depending on whether the law was special, but legislative, whether wise or not. Wheeler v. Philadelphia, 77 Pa. St. 338; Kilgore v. Magee, 85 Id 401; Rutgus v. New Brunswick, 42 N. J. Law 51, 407. Every intendment is to be made in favor of the constitutionality of the law. Kerrigan v. Force, 68 N. Y. 381; State v. Nelson County, 1 N. D. 88; Allen v. Pioneer Press Co., 41 N. W. Rep. 936.

Burke Corbett for respondent:

The principle of·permitting the lender of money to exact a bonus or commission from the borrower is amply sustained by the courts. Van Tassell v. Wood, 12 Hun 388; Dayton v. Moore, 30 N. J. Eq. 543; Morton v. Thurber, 85 N. Y. 550; Atlanta, etc., Mining Co. v. Gwyer, 48 Ga. 11; Eaton v. Alger, 2 Ab. Pr. 5; Eldridge v. Reed, 2 Sweeney, 155; Cockle v. Flack, 93 U. S. 344; Trother v. Curtis, 19 Johns. 160; Thurston v. Corne, 38 N. Y. 281; Hall v. Daggett, 6 Cow. 513; Harger v. McCullough, 2 Denio 119. By § 11 of said act "none of the provisions of this act shall apply to any building and loan association incorporated under the provisions of any law of this State." Section 11 of article 1 of the State constitution provides that "all laws of a general nature shall have a uniform operation." A law is not general within the meaning of the

constitution simply because it bears equally upon all persons to whom it is applicable.   A general law must be as broad as its object.   Ex parte Westerfield, 55 Calf. 550.   A statute which selects particular individuals from a general class and subjects them to particular rules, from which others in the same class are exempt, is a special law.   State v. Hermann, 75 Mo. 340. Special legislation being prohibited by the constitution, courts will not sustain statutes of which the form alone is general but whose operation and effect are special.   State v. Judges, 21 Ohio St. 11.   By the exemption of building and loan associations from this act it gives them the right to make their contracts in any manner they choose, and seeks to take the like privilege from all other persons and classes.   It is equivalent to a special statute, and hence unconstitutional.   Gordon v. Winchester, 12 Bush. 110, 23 Am. Rep. 713.   Subd. 13 of article 2 of § 69 declares that the legislature shall not pass special laws regulating the rate of interest on money, yet under this act building and loan associations, and they alone of all persons and corporations, are exempt from the provisions of the statute.   They would be privileged to take any rate of interest they could procure and by any device they should resort to.   This they cannot do, and the law will detect and prevent the taking of usury under whatever guise it may be cloaked. Philadelphia, etc., v. McKnight, 35 Pa. St. 470; Parker v. Fulton, 42 Ga. 251; Await v. Eutaw, 34 Md. 435; Bank v. Newman, 50 Md. 62; Patterson v. Albany, etc., 63 Ga. 373. By declaring § 11 of the act in question alone unconstitutional, and holding the balance of the act good, the court would assume the functions of a legislative body by enacting a law applying to all persons, building and loan associations alike with all other persons, but such was not the intent of the legislature.   The vicious part of an act must be distinct and separable, and when stricken out enough must remain to be a complete act and sufficient to accomplish the object of the law as passed, in accord with the intent of the legislature.   Meshmeier v. State, 11 Ind. 485; Burkholtz v. State, 16 Lea. 71; Bittle v. Stuart, 34 Ark. 224; Allen v. Louisiana, 103 U. S. 80; People v. Porter, 90 N. Y. 68.   It may be laid down generally as a sound proposition

that one part of a statute cannot be declared void and leave any other part in force, unless the statute is so composite, consisting of such separable parts that when the void part is eliminated another part remains, capable by its own terms of being carried into effect, consistent with the intent of the legislature.  People v. Cooper, 83 Ill. 585; Ex Parte Towles, 48 Tex. 413; State v. Clinton, 28 La. Ann. 201; Ex Parte Wells, 21 Fla. 280; Hinze v. People, 92 Ill. 406; Lombard v. Antioch College, 60 Wis. 459; Sparrow v. Commissioner, 56 Mich. 567; People v. Luby, 56 Mich. 551:  When the different provisions of an act look to one object and its incidents, and are so connected with each other that if its essential provisions are repugnant to the constitution, the entire act must be deemed unconstitutional and void.  Commonwealth v. Hitchings 5 Gray 482; Jones v. Robbins, 8 Gray 329, 339; State v. Commissioner, 5 Ohio St. 497; State v. Sinks, 42 Ohio St. 345; Railroad Co. v. Railroad Co., 28 Kan. 453; Rood v. McCargar, 49 Cal. 117; State v. Stark, 18 Fla. 255; Sparhawk v. Sparhawk, 116 Mass. 315, 320; People v. Cooper, 83 Ill. 585; Hinze v. People, 92 Ill. 406.  If the parts of a statute are so connected as to warrant the conclusion that the legislature intended them as a whole, and would not have enacted the part held valid alone, when a part is unconstitutional, they are not separable; if one part is void the whole is void.  Eckhart v. State, 5 W. Va. 515; Warren v. Mayor, 2 Gray, 84; State v. Sinks, 42 Ohio St. 345; People v. Cooper, 83 Ill. 595; State v. Pugh, 43 Ohio St. 98; Rader v. Township of Union, 39 N. J. Law 509; Flanagan v. Plainfield, 44 Id 118; State v. Commissioners, 38 Id 320; Telegraph Co. v. State, 62 Tex. 630; Childa v. Shower, 18 Iowa 261; Lathrop v. Mills, 19 Cal. 513; Moore v. New Orleans, 32 La. Ann. 726; Robinson v. Bidwell, 22 Cal. 379.

Cochrane & Feetham of counsel, for respondents:

The sole question presented by this appeal is the constitutionality of chapter 184 of the Laws of 1890, defining usury and prescribing punishments therefor.  In the construction of statutes it is a rule of universal application that effect must be given to the words of the legislature, if there is no uncertainty

or ambiguity in their meaning.   Comp. Laws, N. D., § 4731;
Farrel Foundry v. Dart, 22 Conn. 376; Pearce v. Atwood, 13
Mass. 324; Doan v. Phillips, 12 Pick. 223; Fitzpatrick v. Geb-
hart, 7 Kan. 36.   Statutes must be construed *in pari materia.*
Converse v. U. S., 21 How. 463; State v. Garthwaite, 23 N. J. Law
143; Maniel v. Maniel, 13 Ohio St. 458; Bruce v. Schuyler, 94
Ill. 221; Isham v. Bennington Iron Co., 19 Vt. 230; People v.
Jackson, 30 Cal. 427; Henry v. Tilson, 17 Vt. 479.   The specifi-
cation of particulars in an instrument or statute is an exclusion
of generals.   Potter's Dwarris on Stat. 674; Story on Constitu-
tion 448; Watkins v. Wassail, 20 Ark. 410; Sweckard v. Bailey,
3 Kan. 507.   If § 11 of this act is in conflict with the con-
stitution, then the entire act will fall.   The general test rule
is that where a part of a statute is unconstitutional, the remainder
will not be adjudged void unless all the provisions are con-
nected in subject-matter, dependent upon each other, operating
together for the same purpose, or otherwise so connected together
in meaning that it cannot be presumed the legislature would
have passed the one without the other.   Slossen v. Racine, 13
Wis. 398; State v. Donsman, 28 Wis. 531; Slinger v. Hinneman,
38 Wis. 504; Dells v. Kennedy, 49 Wis. 555; State v. Tuttle,
53 Wis. 45; In Re Devancine, 31 How. Pr. 343; People v.
Briggs, 50 N. Y. 553.   But to reject § 11 of this act would
be a subjection of building and loan associations to the opera-
tion of a law which the legislature desired expressly to except
from the usury penalties; would thwart the express legislative
intent.   Cooley's Const. Lim. 214; Rygate v. Wadsboro, 30 Vt.
746; Carnpan v. Detroit, 14 Mich. 266; Myers v. Berlandi, 39
Minn. 447; Emlie v. Caroline, 9 Wheat. 381; People v. Dana,
22 Cal. 11; Simmons v. Powers, 28 Vt. 354; Tyman v. Walker, 33
Cal. 634; Brown v. Wright, 15 N. J. Law 240; State v. Sauk
County, 22 N. W. Rep. 573.   The entire act is void.   The excep-
tion of building and loan associations from the terms of this
statute is as obnoxious to the restraint put upon special legis-
lation by the constitution as would have been a special act of
the legislature authorizing the taking by them of any rate of
interest.   Clark v. State, 14 At. Rep. 582: Utse v. Hyat, 9 S. E.
Rep. 338; State v. Melica, 17 At. Rep. 941; Board v. Buck, 7 At.

Rep. 860; Henderson v. Johnson, 10 S. W. Rep. 788. A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special and comes within the constitutional inhibition. State v. Miller, 13 S. W. Rep. 679; Wheeler v. Philadelphia, 77 Pa. St. 338; In Re Elevated Railroad, 70 N. Y. 328, In Re Church, 92 N. Y. 4. A determination whether or not a given law is general will proceed from a consideration both of the purpose of the act and the objects on which it is intended to operate. State v. Sloan, 8 At. Rep. 104; State v. Miller, 13 S. W. Rep. 679; State v. Sloan, 49 N. J. Law 356; Board v. Buck, 16 At. Rep. 701.

The opinion of the court was delivered by

BARTHOLOMEW, J. This is an agreed case submitted to the district court of the First district under the provisions of § 5540 of the Compiled Laws. The action is brought to recover judgment on a promissory note, and the statement shows that on July 1, 1890, appellant executed and delivered to respondent his promissory note of $575, due in five years, with interest at the rate of 7 per cent. per annum. The first interest payment became due September 1, 1890, and subsequent interest to be paid semi-annually. At the time of executing the note the appellant received from the respondent the sum of $500 and no more. The remaining $75 was by agreement retained by respondent as a compensation or fee for making such loan. Default was made in the first interest payment. The case turns largely upon the constitutionality of chapter 184 of the Laws of 1890. This chapter is entitled "An act defining usury and the penalty for taking the same," and it fixes the rate of interest, in the absence of a different contract, at 7 per cent. per annum, and fixes 12 per cent. as the limit that may be lawfully contracted for, and declares all contracts whereby a greater rate is, either directly or indirectly, received or contracted to be paid, to be usurious and void from the beginning, with an exception saving negotiable paper in the hands of a *bona fide* purchaser for value before maturity. The fourth section reads as follaws: "In all written contracts for the loan of money, the exact amount

agreed upon to be received for the use, by the borrower, shall be stated in the contract, and, separately therefrom, the rate per cent. thereon of interest contracted to be charged; and if in any contract, either verbal or written, for the loan of money, the borrower receives a less sum than the principal sum so agreed upon and contracted to be loaned to and received by the borrower, the said contract shall be deemed to be usurious, except as otherwise herein provided." The seventh section provides that any broker, loan agent, or other person may receive a compensation for obtaining a loan, or forbearance of money, where such compensation, added to the interest expressed in the contract, does not exceed in the aggregate 12 per cent. per annum interest. If the compensation and interest named exceed 12 per cent., then the entire contract is declared usurious and void. It is apparently conceded, as no question is made on the point, that the note in suit in this case violates the provisions of § 4, above quoted, unless the words, "except as otherwise herein provided," bring the transaction within the provisions of § 7. As the $75 retained added to the 7 per cent. stated in the note, would not exceed in the aggregate 12 per cent. per annum on $500 for five years, it is claimed that the transaction is valid, under § 7. We cannot admit such construction. In this case there is no middleman. The law can recognize no consideration passing from respondent to appellant except the loan of the money, and the amount retained by respondent was simply interest taken in advance. We do not think the transaction can be brought within the terms of § 7. Section. 4 was enacted for a specific, well understood purpose. Few contracts are made that are usurious on their face. It is the almost universal custom to cover up the usury, either by misstating the amount of the loan or the correct rate of interest paid or contracted to be paid. The legislature intended by § 4 to effectually destroy any such cover, and to that end it, in positive terms, required parties to embody in the written contract the true contract, both as to amount loaned and interest paid or contracted to be paid. It matters not what the rate may be. It must be truly stated, or the contract is declared usurious and void. If the contracts mentioned in § 4 are

usurious only when the interest exceeds 12 per cent., or when
the interest and compensation together exceed 12 per cent.,
then § 4 is a useless and purposeless enactment; as such
contracts would in every case be usurious and void under the
other sections of the chapter. We cannot adopt a construc-
tion of § 4 which renders it mere surplusage. The fact that
the law is unusually stringent or even harsh in some of its pro-
visions, or that by it our legislature has declared contracts
usurious for reasons not heretofore known to the law, are mat-
ters with which we are not concerned, if the statute is a consti-
tutional enactment. But, granting that the note in question
violates the provisions of § 4, it is contended that said sec-
tion, and the entire chapter 184 is unconstitutional by rea-
son of the exception contained in § 11, which reads as fol-
lows : "None of the provisions of this act shall apply to any
building and loan association incorporated under the provis-
ions of any law of this state." It is claimed that this section
is a violation of § 11 of the state constitution, which re-
quires all laws of a general nature to have a uniform operation;
and also of § 20, which forbids the granting of privileges
or immunities to any citizen, or class of citizens, which, upon
the same terms, shall not be granted to all citizens; and also
of subdivision 13 of § 69, which prohibits the legislature
from passing any special law "regulating the rate of interest
on money." The questions thus presented are by no means
free from embarrassment. We are asked to annul an impor-
tant legislative enactment—one that reached the statute book
only after receiving the sanction of the deliberate judgment of
the legislature and the executive. The subject, too, is one
peculiarly within the legislative branch of the government, and
a proper control of the matter of usury has long been regarded
as one of the most beneficial and salutatory objects of legisla-
tion. This is a case which demands implicit adherence to that
well established rule which requires courts to respect and en-
force the will of the legislature, unless there has been a clear
and unequivocal violation of the fundamental law of the state.
"A statute relating to persons or things as a class is a general
law; one relating to particular persons or things of a class is

special." Suth. St. Const. § 121. "Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances." Id § 127. An inspection of the statute under consideration at once discloses that it does not come within the above definition of a special law. Nor does it grant any privileges or immunities to any citizen that would not equally extend to any other citizen coming within the class to which the exception applies. It is a statute general in form and general in its nature. If its operation be in any manner special, or if it grant privileges or immunities to any citizen or class of citizens that are not granted to all, it is because the statute is not literally uniform in its operation; and it becomes important to determine whether this lack of uniformity is of such a character as to violate the constitutional provision requiring all laws of a general nature to have a uniform operation. This provision is found in the constitution of a number of the states, and it has been before the courts in a large number of cases, and it has also been held that this provision was intended to prevent the granting to any citizen or class of citizens of privileges or immunities which, upon the same terms, shall not belong to all citizens. McGill v. State, 34 Ohio St. 237; Suth. St. Const. § 121; French v. Teschemacher, 24 Cal. 544. A "general law," as the term is used in this constitutional provision, is a public law of universal interest to the people of the state, and embracing within its provisions all the citizens of the state, or all of a certain class or classes of citizens. It must relate to persons and things as a class, and not to particular persons or things of a class. It must embrace the whole subject, or a whole class, and must not be restricted to any particular locality within the state. Case v. Dillon, 2 Ohio St. 607; Kelley v. State, 6 Ohio St. 269; Wheeler v. Philadelphia, 77 Pa. St. 338; State v. Wilcox, 45 Mo. 458; Van Riper v. Parson, 40 N. J. Law 123; *In re* Boyle, 9 Wis. 240; McGill v. State, 34 Ohio St. 237. The uniform operation required by this provision does not mean universal operation. A general law may be constitutional, and yet operate in fact only upon a very limited number of persons or things, or within a limited territory. But, so far

as it is operative, its burdens and benefits must bear alike upon all persons and things upon which it does operate, and the statute must contain no provision that would exclude or impede this uniform operation upon all citizens, or all subjects and places, within the state, provided they were brought within the relations and circumstances specified in the act. McGill v. State, 34 Ohio St. 246; Smith v. Judge, 17 Cal. 554; Darling v. Rodgers, 7 Kan. 592; Leavenworth Co. v. Miller, Id 479; Groesch v. State, 42 Ind. 547; Heanley v. State, 74 Ind. 99; State v. Wilcox, 45 Mo. 458; People v. Wright, 70 Ill. 398; McAunich v. Railroad Co., 20 Iowa, 338; Humes v. Railway Co., 82 Mo. 221; Railway Co. v. Iowa, 94 U. S. 155.

From the foregoing proposition it follows of necessity that the legislature has power to classify persons and subjects for the purpose of legislation, and to enact laws applying specially to such classes, and, while the laws thus enacted operate uniformly upon all members of the class, they are not vulnerable to the constitutional inhibition under consideration. But this power of the legislature is circumscribed. It is not an arbitrary power waiting the whim of the legislature. Its exercise must always be within the limits of reason, and of a necessity more or less pronounced. Classification must be based upon such differences in situation, constitution or purposes, between the persons or things included in the class and those excluded therefrom, as fairly and naturally suggest the propriety of and necessity for different or exclusive legislation in the line of the statute in which the classification appears. State v. Hammer, 42 N. J. Law 439; Nichols v. Walter, 37 Minn. 264, 33 N. W. Rep. 800; Board v. Buck, 51 N. J. Law 155, 16 Atl. Rep. 698; Railway Co. v. Markley, 45 N. J. Eq. 139, 16 At. Rep. 436; Miller v. Kister, 68 Cal. 142, 8 Pac. Rep. 813; City of Reading v. Savage, 124 Pa. St. 328, 16 Atl. Rep. 788; Hanlon v. Board, 53 Ind. 123; State v. Reitz, 62 Ind. 159.

The application of these principles to the case before us will advance us toward a correct conclusion. By § 11 above quoted, our legislature placed building and loan associations, incorporated under the laws of this state, in a separate class, and excepted them from the operation of the usury law. Is this

such a classification as the legislature had authority to make? The business of money loaning has its representatives in every community. The almost universal object of the lender is to increase his capital by such sums as. the business indiscretion of his neighbors may permit, or their necessities compel them to pay for the use of the money loaned to them. To check the rapacity of capital, and to prevent unconscionable advantage being taken of mismanagement, misfortune, or inexperience, governments, in the exercise of their police power, have seen proper to place a limit upon the amount that may be charged for the use of money, and thus compel, the capitalist to deal with his less fortunate fellow-men in a spirit of fairness and liberality. But the theory and purpose of building and loan associations are entirely different. These associations are, presumably at least, composed of men who are not capitalists, but who desire to form a fund from their mutual earnings that shall be mutually beneficial. To this end the persons subscribing for the stock of these associations agree to pay therefor in small amounts, at stated intervals, and to continue such payments until the amounts so. paid, added to the profits that may be realized on the stock, equal its par value, and provisions are made for fines and forfeitures in case of non-payment. The stock is issued in one series, or in successive series, and all the stock of any one series which has not been forfeited will reach par at the same time, and the purposes of the association as to such stock will then be at an end, and the assets will be distributed, and the association dissolved. The fund so accumulated is, primarily, for the use of the stockholders. In the absence of express statutory authority, a building and loan association cannot loan its money outside of its own members. Endl. Bldg. Assn's. 312; Wolbach v. Association, 84 Pa. St. 211; State v. Association, 35 Ohio St. 258. Neither can a loan be made to a stockholder in excess of the par value of his stock. When a certain amount (not less than the par value of one share of stock) is accumulated, the money is put up for sale, usually termed "auction," and that member who is willing to pay the highest premium, or who is willing to have the largest amount deducted when the premium is deducted from the loan,

receives a loan equal to the par value of the stock held by such
party, and assigns his stock to the corporation as collateral secur-
ity.    But his duty to continue his payments upon his stock is not
changed, and should he fail in that duty, his stock would become
forfeited; hence he is also required to execute his note for the
loan, with mortgage security, and generally to pay interest on the
amount until the note is paid.    No definite date for payment is
fixed.    In theory, and generally in practice, the time of pay-
ment arrives when the stock reaches par, and the corporation
as to such stock ceases to exist, and the member receives as his
share of the assets his own note and mortgage.    Under our
statute the member has the right to pay his note at any time,
and thus stop the interest, and in that case would, of course, be
entitled, on the dissolution of the corporation, to receive the
value of his stock in cash.    But the effect of the transaction,
generally speaking, is simply this:    The association uses the
fund to purchase the stock of that member who is willing to
sell his stock in advance for the least money, and continue the
payments upon stock subscription until the value of his stock
reaches par.    It will be noticed that all the stock receives the
benefit of the premiums paid, that of the party receiving the
so-called loan equally with that of the other stockholders, and
the larger the aggregate premium paid the sooner the value of
the stock will reach par, and the sooner the stated payments on
account of stock subscriptions will cease.    Endlich on Building
Associations, at page 161, says: "If we consider the reasons
which may be assumed to have guided legislatures in conferring
upon building associations the extraordinary privileges and im-
munities which they enjoy, it will be readily understood (and
there can be no other apology for it) that at the bottom of it all
is a motive of public policy.    The primary design of build-
ing associations is to encourage the acquisition of real estate,
the building of dwellings, the ownership of homesteads, to in-
crease the proportion of property holders among that class of
the population whose slow and laborious earnings are, by rea-
son of their pettiness, most fugitive, and generally spent before
they reach a sum of sufficient magnitude to back a desire for
those guaranties of good citizenship which the policy of our

law has always found in landed property. That is the class for whose benefit building associations were originally devised, from among whose numbers their membership was, and for the most part still is, drawn, and all the incidents of membership were designed to accommodate their necessities and intended to serve their purposes." The legislature of Dakota territory (§ 3, c. 41, Laws 1889) used the following language: "As building and loan corporations are aggregations of laborers, mechanics, workmen and working women, which start without any paid-up capital, and as these members only pay each month an assessment in proportion to shares, for the purpose of furnishing a home to each of its members in turn, which assessment stops the moment that every member has been thus furnished with such a home, these associations are hereby declared to be benevolent institutions, within the meaning of § 2, c. 28, of the Political Code of 1877." Rev. Laws. It is at once apparent that the transactions of these associations are separated by essential differences from the ordinary loaning business. The reasons and causes on which usury laws are based are largely absent. It was early said in England: "The defendant was interested in the fund when it was advanced and when it was paid. The rules of the society are, in effect, a mere agreement by partners that their joint contributions shall be advanced for the use of the one or the other, as occasion requires, and the transaction was not a borrowing by the maker of the note from the payee" (Silver v. Barnes, 6 Bing. N. C. 180); and this ruling has been uniformly followed in that country. In the case of Association v. Lake, 69 Ala. 456, in speaking of the workings of these associations, it is said: "The lettings of the moneys are frequently called 'loans,' but they are not strictly loans. The principal is never to be repaid. It is an advance payment by the corporation of the agreed value the shares owned by the bidder are to represent and have at the final completion of the enterprise and the dissolution of the corporation." The courts in a number of the states have adopted what is usually termed the "English rule," while in perhaps an equal number of states the courts have with more or less strictness treated these associations as ordinary money-loaning institutions. The de-

cisions will be found quite fully collected in 2 Amer. & Eng. Enc. Law, p. 608 *et seq.* The fact that learned courts, in the absence of statutes, have been so impressed with the inherent differences existing between the legitimate transactions of building and loan associations and the ordinary transactions of the money loaner, that they have refused to apply to the former the rules of law governing the latter, ought in itself to be conclusive of the fact that these differences are such as to naturally suggest the propriety and necessity for distinct legislation for the two classes; and it will be noticed, too, that these differences are directly in the line of what would be proper payment for the use of the money in the one case and what in the other. Another fact is significant. The incorporation of building and loan associations in the territory of Dakota was first authorized by chapter 34, Laws of 1885; and § 6 of that chapter provides (and this provision is very common in the laws authorizing such corporations) that no premiums, fines, or interest on premiums that may accrue to the corporations shall be deemed usurious. In all ordinary loan transactions, when no consideration passed to the borrower except the loan of the money, any so-called premium that might be paid for such loan would at once be branded by the courts as a cover for usury, and the transaction would be declared usurious, with whatever results might follow. The law that brings these associations into existence declares them to be so far *sui generis* that the performance of their functions requires the suspension in their favor of certain rules of law that are applied to all other parties. It seems very clear to us that the operations of building and loan associations, when confined to their own numbers, differ so radically from ordinary loan transactions that the legislature was clearly warranted in placing such associations in a separate class for the purposes of such legislation as pertains to interest and usury; and, the classification being once established, the extent to which the classes shall be separated is purely a matter of legislative discretion. The legislature has the right to leave such associations untrammelled in the matter of premiums paid for loans, and it has an equal right to leave them untrammeled in the matter of interest proper.

But we have been somewhat embarrassed by reason of our previous legislation on this subject. By chapter 34, Laws 1885, heretofore mentioned, these associations were confined in their operations to their own members and were not allowed to charge interest, as such, to exceed 12 per cent. per annum. That chapter was amended by chapter 34 of the Laws of 1887, but was not changed in the particulars above mentioned; but in 1889 another act pertaining to these associations was passed (chapter 40, Laws 1889), § 7 of which reads as follows: "That any funds of such corporation not loaned for a period of more than thirty days, and for which there is no sufficient demand under the provisions of the articles of incorporation and by-laws of the corporation, may be loaned by the corporation at any rate of interest allowed by law, upon any security approved and accepted by the board of directors of said corporation." This section, as we construe it, authorizes these associations, upon the conditions in the section specified, to loan their funds to outside parties at legal rates of interest. It must be conceded that, as to such transactions, building and loan associations differ in no material respect from other money-loaning institutions, and that as to them all the reasons upon which legislative classifications are sustained are wanting. Hence, if the exception contained in § 11 of chapter 184 of the Laws of 1890 must be held to include such transaction, then such chapter is not uniform in its operation and violates the constitutional provision. But, if consistent with legal principles, it is our duty to harmonize this statute with the constitution, and our efforts should first be directed towards ascertaining, if we can, the true intent and purpose of the legislature in the enactment of said § 11. The statute—the whole statute in which said section is found—is the first source to which we should turn for information, and it is also our right and duty to consider all other statutes *in pari materia.* Suth. St. Const. 316, and cases cited. "The general intent must be kept in view in determining the scope and meaning of any part." Id 317, and cases cited. The one prominent thought pervading the statute in question is the suppression of the mischief of usury. The sweeping terms used, the harsh and unusual penalties pre-

scribed, the evident care that no avenue of escape remain unguarded, leave no room to doubt the purpose and intent of that statute. What did the legislature intend to accomplish in excepting building and loan associations from its provisions? The thought should be emphasized that these associations are organized, primarily, for the purpose of dealing with their own stockholders, as hereinbefore described, and that as to such dealings they may constitutionally be exempted from the operation of all usury laws; that their only authority for dealing with outside parties comes from § 7, chapter 40, Laws 1889; and that the conditions therein prescribed are exceptional, and in properly organized and conducted associations will rarely or never occur, particularly as § 9 of the same chapter gives the directors authority to force the withdrawal of all unpledged stock. Mr. Endlich, in speaking of loans to outside parties, says (page 160): "Yet such loans must be regarded as shifts, allowable from the necessities of the case, for the purpose of obviating the contingency of its funds remaining idle on its hands for lack of members to take them up." These associations are not organized to transact any such business. It is a mere incident that may or may not be forced upon them. The legislature of 1889, in defining these associations as "benevolent institutions," did not contemplate or include these dealings with outside parties. Did not the legislature of 1890 use the term in the same sense? Prior to the passage of the law of 1890 these associations could not charge their own stockholders interest, as such, in excess of 12 per cent.; and, if the legislature desired to remove that restriction, § 11 had an office to perform. But should we hold that the section goes further and includes these now exceptional transactions with outside parties, then the gates would be thrown down and the promoters of any monied institution could organize strictly in accordance with the statute as a building and loan association, pay in their stated stipends, and, as there would be no demand whatever for the money among the stockholders, all the funds could be loaned to outside parties, with no restrictions whatever as to form of contract or rate of interest, and the result would be the exact reverse of what the legislature intended in passing the

law.  Such a construction should only be adopted when forced upon the court.   But it must be admitted that to adopt the narrower construction compels this court to place a limitation upon the language of the legislature.   Have we that power?   In the case of State v. Emerson, 39 Mo. 87, the court said: "In construing an instrument the true intention of the framers must be arrived at, if possible, and, when necessary, the strict letter of the act, instrument or law, must yield to the manifest intent." In Whitney v. Whitney, 14 Mass. 92, this language is used: " Therefore many cases not expressly named may be comprehended within the equity of a statute, the letter of which may be enlarged or restrained according to the true intent of the maker of the law."   The supreme court of Vermont has said: "Effects and consequences of a construction are to be considered, and when, from a literal interpretation, an effect would follow contrary to the whole intent and spirit of the statute, the intent and not the literal meaning must be regarded."   Ryegate v. Wardsboro, 30 Vt. 746.   In People v. Insurance Co., 15 Johns. 358, it is said: "Whenever such intention can be discovered it ought to be followed with reason and discretion in the construction of the statute, although such construction seems contrary to the letter of the statute.   *   * A thing which is within the intention of the maker of the statute is as much within the statute as if it were within the letter, and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers, and such construction ought to be put upon it as does not suffer it to be eluded."   But the federal supreme court has perhaps gone as far as any court in giving effect to the intent of the law makers: "The spirit as well as the letter of a statute must be respected, and when the whole context of the law demonstrates a particular intent in the legislature to effect a certain object some degree of implication may be called in to aid the intent."   Durousseau v. U. S., 6 Cranch. 307.   "It is undoubtedly the duty of the court to ascertain the meaning of the legislature from the words used in the statute and the subject-matter to which it relates, and to restrain its operation within narrower limits than its words would import, if the court

are satisfied that the literal meaning of its language would extend to cases which the legislature never designed to embrace in it." Brewer v. Blougher, 14 Pet. 178. "If it be true that it is the duty of the court to ascertain the meaning of the legislature from the words used in the statute, and the subject-matter to which it relates, there is an equal duty to restrict the meaning of general words when it is found necessary to do so in order to carry out the legislative intention." Reiche v. Smythe, 13 Wall. 162. "A thing may be within the letter of a statute, and not within its meaning, or within the meaning, though not within the letter." Atkins v. Disintegrating Co., 18 Wall. 302. From these eminent authorities it follows that we have the undoubted right, and it is our solemn duty, to so construe chapter 184 of the Laws of 1890 as to effect the clear intent and purpose of the legislature in its enactment, although such construction may require us to place a limitation upon the language used. We hold, therefore, that the provisions of § 11 of said act, excepting building and loan associations incorporated under the laws of this state from the operation of the act, was not intended to include, and does not include, the transactions of any such association with any parties other than its own stockholders; and that, as thus limited, the legislature had the power to make the exception; and that, as said chapter is uniform in its operation upon all classes upon which it does operate, it is not vulnerable to any of the constitutional objections urged. The district court is directed to reverse its judgment and dismiss the case. Reversed. All concur.

CORLISS, C. J. (*concurring.*) I do not understand that the court decides in this case whether the transaction which is attacked as usurious comes within § 4 of the usury law. The question was not argued at the bar of this court, and it is too difficult of solution, and the consequences of a mistake are too far-reaching, to justify an interpretation of § 4 without full argument touching its proper meaning. It having been assumed by all parties that the case fell within § 4, and the entire argument having been directed to the question whether the

statute is constitutional, I refrain from expressing any opinion as to the true meaning and scope of § 4. I fully agree with my Brother BARTHOLOMEW in his opinion that the statute is constitutional.