## MESSENA B. ERSKINE *vs.* NELSON COUNTY.

Opinion filed December 2nd, 1893.

**Counties—Ultra Vires Contracts—Curative Act.**

> To legalize void evidences of municipal indebtedness, the purpose to validate them must be clearly expressed by the legislature, or be deducible from the statute by necessary implication. The statute referred to in the opinion examined, and *held* to so far validate void county warrants theretofore issued that the plea of *ultra vires* could not thereafter be interposed as a defense thereto.

CORLISS, J., dissenting.

Appeal from District Court, Nelson County; *Templeton,* J.

Action by Messena B. Erskine against the County of Nelson to recover on county warrants. From the judgment rendered, plaintiff appeals.

Modified.

*Newman & Resser,* for appellant.

The bonding act was mandatory in fact although permissive in form, its object was to enable the county to pay outstanding warrants for which it had received consideration. The holders of these warrants were to be benefited by the provisions of the law. Southerland on Statutory Const. 598; *Supervisors* v. *United States,* 4 Wall. 435; *Mason* v. *Fearson,* 9 How. 259; *Galena* v. *Amy,* 5 Wall. 705; *Ry. Co.* v. *Napa Co.,* 52 Cal. 435; *Stanton* v. *Ashbury,* 41 Cal. 525; *Peo.* v. *Supervisors,* 51 N. Y. 401; *Conway* v. *Supervisors,* 68 N. Y. 114; *Lockport* v. *Supervisors,* 49 Hun. 32.

The legislature is presumed to have acted upon evidence and to have had full knowledge of all facts involved in their action and not to have done a vain thing. Sutherland on Stat. Const. 331; *Brown* v. *The Mayor,* 63 N. Y. 239; *Shaver* v. *Eldred,* 114 N. Y. 243. The provision for the payment of the warrants validates them by implication and is as effectual for that purpose as though the statute expressly declared the warrants valid. Southerland on Stat. Const. § 334; *United States* v. *Babbit,* 1 Black. 55; *Beloit*

v. *Morgan*, 7 Wall. 619; *Brown* v. *Mayor*, 63 N. Y. 339; *Nelson* v. *Mayor*, 63 N. Y. 535.

*Wm. H. Standish*, for respondent.

The warrants were issued for sums beyond what could be realized from the taxes levied for the then current year—were not authorized by a vote of the people and are *ulra vires* and void. *Crampton* v. *Zabroski*, 25 Law Ed. 1670, 11 Otto 601; *United States* v. *Macon County*, 8 Otto 624, 25 Law Ed. 331; *Anthony* v. *Jasper County*, 101 U. S. 693, 25 Law Ed. 1005; *Wells* v. *Supervisors*, 102 U. S. 625, 26 Law Ed. 122; *City of Parkersburg* v. *Brown*, 1 Sup. Ct. Rep. 442; *Ogden* v. *County*, 102 U. S. 634, 26 Law Ed. 263; *Hopper* v. *Town of Covington*, 6 Sup. Ct. Rep. 1025; *County of Daviess* v. *Dickinson*, 6 Sup. Ct. Rep. 897; *Dixon County* v. *Field*, 111 U. S. 834; *Lake County* v. *Rollins*, 9 Sup. Ct. Rep. 651; *Lake County* v. *Graham*, 9 Sup. Ct. Rep. 654; 1 Dillon Muc. Corp. 44; *Capital Bank of St. Paul* v. *School Dist. No. 53*, 1 N. D. 479, 48 N. W. Rep. 363; *Bank* v. *Willow Lake School Tp.*, 1 N. D. 26, 44 N. W. Rep. 1002. The corporation is not estopped to set up the defense of *ultra vires*, it is bound only where its agents or officers, keep within the limits of the chartered power. 1 Dillon Muc. Corp. 567, 361; *Wall* v. *Monroe County*, 13 Otto 74; *Mayer* v. *Ray*, 19 Wall. 468; *Hodges* v. *Buffalo*, 2 Denio 110; *Halstead* v. *Mayor*, 3 N. Y. 430; *People* v. *County*, 11 Cal. 170; *Sturdefant* v. *Liberty*, 46 Me. 457; *Smith* v. *Chesire*, 13 Gray 318; *Dalrymple* v. *Whittingham*, 26 Vt. 185; *Hubbard* v. *Linden*, 28 Wis. 674. These warrants having been issued without authority of law are void in the hands of purchasers. *Goodnow* v. *Commissioners*, 11 Minn. 12; *County* v. *Wolcott*, 13 Otto 559; *Gould* v. *Town*, 23 N. Y. 463; *Bissell* v. *Ry. Co.*, 22 N. W. Rep. 289; *Clark* v. *City of Des Moines*, 19 Ia. 199; Field on *Ultra Vires*, 449. The evidence of ratification should be as clear as that of an original authority and no act operates as a ratification, unless with a full knowledge of the circumstances it was so intended to operate. *Wisconsin Bank* v. *Morley*, 19 Wis. 72; *Savage* v. *Davis*, 18 Wis. 608; *Dodge* v. *McDonnell*, 14 Wis.

601; *Awings* v. *Hull*, 9 Peters 607; 1 Parsons on Const. 54; *Dickinson* v. *Conway*, 12 Allen, 493; *Gill* v. *Bailey*, 17 N. H. 18; *Hozeldew* v. *Batchelder*, 44 N. H. 40. The intention of the legislature to validate the warrants must clearly appear from the terms of the curative act. Dillon Muc. Corp. 637, § 544; *Hayes* v. *Holly Springs*, 5 Sup. Ct. Rep. 785, 114 U. S. 120.

BARTHOLOMEW, C. J. The plaintiff sought to hold the defendant liable upon certain county warrants. These warrants were regular in form, and purported to be used for debts incurred by the county; but it is uncontroverted that, in so far as the trial court refused to give judgment upon these warrants against the defendant, the warrants were originally illegal and void. The debts which they represented were obligations which the board of county commissioners had no authority to create, because the expenditures at the time were in excess of the amount which could be provided for by the current revenue of the county from the tax levy of the year. It is unnecessary to refer to the statute or other authority which renders void these warrants representing such expenditures. The counsel for plaintiff makes no contention against their original invalidity, but strenuously urges here that they have been transmuted into legal obligations of the county by an act of the legislature passed March 13, 1885, which provides as follows:

"An act to authorize the county commissioners of Nelson County, Dakota, to fund the outstanding indebtedness thereof.

"*Be it enacted by the legislative assembly of the Territory of Dakota:*

"SECTION 1. That the board of county commissioners of the County of Nelson, in the Territory of Dakota, be empowered, and are hereby authorized, to issue bonds for not less than five hundred (500) dollars each, the total amount of such issue not to exceed thirty thousand (30,000) dollars; said bonds to draw interest at a rate not to exceed eight (8) per cent. per annum, payable annually at the county treasurer's office of said Nelson County. Said bonds shall specify on their face the date, amount, for what purpose issued, the time and place of payment and rate

of interest. Said bonds and coupons thereto attached shall be severally signed by the chairman of the board of county commissioners of said Nelson County, and attested by the clerk or auditor of said Nelson County, said bonds to be payable at the office of the county treasurer of Nelson County, or such other place as the board of county commissioners may designate.

"Sec. 2. Said bonds shall be dated the first day of July, A. D. 1885, and shall be payable in twenty (20) years, with the privilege of calling in said bonds at any time after ten (10) years.

"Sec. 3. The board of county commissioners of said Nelson County is hereby authorized, and it is made their duty to levy a sufficient tax for each year, besides the ordinary tax authorized by law, to be levied for the purpose of paying the interest of said bonds; *provided further*, that seven (7) years after the time of issue of said bonds, it is made the duty of said board of county commissioners to levy a sinking fund for the purpose of paying off and redeeming said bonds, said tax not to exceed two (2) mills on the dollar of the valuation of said county in any one year.

"Sec. 4. It is hereby made the duty of the county treasurer of Nelson county to negotiate the sale of said bonds, and to call in all outstanding county warrants whenever the bonds are sold, and he, said county treasurer, shall be allowed two (2) per cent. commission as his fees, and no more, for negotiating said bonds, and paying out said money; *provided further*, said bonds shall not be sold for less than par.

"Sec. 5. That after issuing the bonds mentioned in § 1 of this act, no warrants shall be issued by the county board unless at the time of issuing the same there is money enough in the county treasury of Nelson County to pay the warrants so issued.

"Sec. 6. This act shall take effect and be in force from and after its passage and approval.

"Approved March 13th, 1885."

Respondent's counsel contends that there was no intent or purpose on the part of the legislature, in the enactment of this

statute, to validate any invalid warrants.    His position may be thus stated in brief:   To legalize void evidences of municipal indebtedness, the purpose to validate them must be clearly expressed by the legislature, or be deducible from the statute by necessary implication, and that in the statute in question there is neither a clearly expressed nor necessarily implied intention to validate any invalid warrants of Nelson County.   The legal proposition involved in this position is sound, both upon principle and authority.    Dill. Mun. Corp. § 544; *Hayes* v. *Holly Springs*, 114 U. S. 120, 5 Sup. Ct. 785; *Beloit* v. *Morgan*, 7 Wall. 619; *Brown* v. *Mayor*, 63 N. Y. 239.   But we encounter here the ever-recurring difficulty of applying recognized legal principles to the facts of a given case.   It might greatly lessen the labor of courts if the legislative intent were always expressed in clear and unequivocal language.    It might benefit the tax payers and the state if validating acts were always couched in express and unmistakable terms. But it is not the province of a court to dictate the language that shall clothe legislative enactments.    Courts may say in certain cases, as they do in this, that they will accept no doubtful construction, but, when that which it is clearly provided shall be done cannot be done without accomplishing a certain result, it must be presumed that it was the legislative purpose to accomplish such result, and courts cannot excuse their failure to give effect to this legislative purpose by saying that the legislature might have used more apt terms in which to declare it.    It must then be our sole purpose, in this case, to ascertain whether the legislature, by the enactment in question, clearly and necessarily evinced the legislative intent and purpose to validate the invalid warrants of Nelson County.

At the time of the passage of said act, certain facts existed,— some of them notorious, and others of them of record, and brought to our attention by the abstract in this case,—of which we must not lose sight, if we would correctly measure the legislative purpose.   The defendant county was organized in June, 1883, without funds in its treasury, and the act in question was passed

at the first session of the legislature thereafter. The total assessed valuation of the county for the year 1883 was $230,330, and the total levy for all county purposes and for roads and bridges was 10 mills on the dollar, making the total revenue for that year $2,303. The assessed valuation of said county for the year 1884 was $771,823. There was no levy whatever for that year, and consequently no authorized revenue for that year. The statute was passed prior to the time fixed by law for the assessment and levy in 1885, and hence dealt with the fiscal affairs of the county as they were left by the tax proceedings for the years 1883 and 1884. Under the law of the then Territory of Dakota, the county commissioners of the defendant county were without power to issue warrants in excess of the amount that could be raised from the tax levy of the current year. All warrants in excess of that amount were *ultra vires* and void. As we have seen, that amount for the year 1883 was $2,303, and for 1884 it was nothing. Prior to March 13, 1885,—the date of the approval of said act,—the defendant county had executed and delivered its warrants to the full amount of $32,739.16. Of this sum, warrants to the amount of $30,436.16 were in excess of the limit fixed by law, and hence invalid. But the county had actually paid upon its warrants the sum of $4,411.53. This the county had been able to do, because, although the trial court found that there was no levy in 1884, yet there was a pretended levy; and the sums voluntarily paid as taxes under such pretended levy, added to the amount realized from the levy for 1883, enabled the county to make such payments. And, as the amount thus paid exceeded the authorized revenue for the two years, it follows that all unpaid warrants were in excess of the limit, and void. But the outstanding warrants, all of which were unauthorized, with the accumulated interest thereon, amounted, at the date of the passage of said act, to the sum of $29,955. The act authorized funding bonds to the amount of $30,000, barely sufficient to cover all outstanding warrants. If, as has been suggested, the act, in speaking of county warrants, meant valid warrants, and no others, then it is

clear that there were no warrants whatevever upon which the act could take effect. No single step could be taken under the act, and it becomes a useless blot upon the statute book. If, on the other hand, by the use of the terms "county warrants," the legislature meant all instruments that were such in form, which had been put forth by the county, purporting on their face to be valid obligations of the county, and if it was the purpose to validate all such instruments, and provide for their payment, then every sentence of the act becomes instinct with life and purpose and usefulness.

The claim is made, however, that there were some valid outstanding warrants; that it is almost universal that there are some delinquent, uncollectible taxes; and that, to the extent of such delinquency, the outstanding warrants would be valid. It seems a sufficient answer to say that there is no claim in the record that there was any delinquency in 1883. But granting the usual percentage of delinquency upon a total tax but little in excess of $2,000, the amount thereof, when compared with the amount of bonds authorized by the act, is too insignificant to affect the rule of construction.

It is urged upon us that these facts which we have been considering were not known to the legislature; that a bill was presented to that body entitled "An act to authorize the county commissioners of Nelson County, Dakota, to fund the outstanding indebtedness thereof," and that such bill was passed without investigation by the legislature as to whether or not Nelson county had any indebtedness, and, if any, how much; that such matters were left entirely to the discretion of the county commissioners. We are not allowed to cast upon the popular branch of goverment this imputation of ignorance and negligence. On the contrary, we are bound to presume that it performed its duty intelligently and faithfully; and, unless the contrary appear from its own records, we think such presumption ought to be conclusive here. At § 331, Suth. St. Const., it is said: "It is not to be presumed that the legislature have assumed the existence of a

fact upon which an act of legislation is based, without evidence. On the contrary, courts are bound to presume that they acted upon good and sufficient evidence, and that presumption is conclusive on the question of the validity of the act. It was so held on an objection to the validity of an act organizing a new county, —that it did not contain the population required by the constitution. It is presumed, as well on the ground of good faith as on the ground that the legislature would not do a vain thing, that it intends its acts, and every part of them, to be valid, and capable of being carried into effect." In *Road Co.* v. *Woodhull*, 25 Mich. 99, Judge Cooley says: "The legislature will not only choose its own modes of collecting information to guide its legislative discretion, but, from due courtesy to a co-ordinate department of the government, we must assume that those methods were the suitable and proper ones, and that they led to correct results. And, if the records show no investigation, we must still presume the proper information was obtained; for we must not suppose the legislature to have acted improperly, unadvisedly, or from any other than public motives, under any circumstances, when acting within the limits of its authority." Again, in *De Camp* v. *Eveland*, 19 Barb. 81, it is said: "It is not to be presumed that the legislature have assumed the existence of a fact upon which an act of legislature is based without evidence. On the contrary, courts are bound to presume that they acted upon good and sufficient evidence, and this presumption is conclusive." See, also, *Lusher* v. *Scites*, 4 W. Va. 11; *Humboldt Co.* v. *Churchill Co. Com'rs*, 6 Nev. 30; *Farmers' Loan & Trust Co.* v. *Chicago, etc., Ry. Co.*, 39 Fed. 143. Under these authorities, we are bound to say that, when the legislature authorized the issuance of the bonds of Nelson County to the extent of $30,000 for the purpose of funding outstanding indebtedness, it did so with full knowledge of the financial condition of Nelson County. And, knowing that the outstanding warrants amounted to nearly or quite the full amount of bonds authorized, it also knew that such warrants were beyond any limit allowed by law, and were necessarily invalid. We say

the legislature knew this, because it knew that Nelson County was but just organized, and its resources were limited. Its assessed valuations for the years 1883 and 1884 were of record in the territorial auditor's office, and the total tax that could have been realized on such valuations under the highest levy permissable to the county would not have equaled, in both of said years, one-third of the amount of the bonds authorized, and the ordinary percentage of delinquency would not have equaled one-tenth of of such amount. Hence, we say that the legislature knew that Nelson County had outstanding warrants amounting to nearly $30,000, and knew that all such warrants were beyond the limit allowed by law, and consequently void. Yet the legislature, after authorizing the issuance of bonds to the amount of $30,000, in express terms declared: "It is hereby made the duty of the county treasurer of Nelson County to negotiate the sale of said bonds, and to call in all outstanding county warrants whenever the bonds are sold." But it was not possible that the treasurer should perform this duty thus unequivocably thrust upon him without paying warrants issued in excess of authority. Hence, the intention of the legislature that such warrants should be paid is unmistakable and unavoidable. Thus far in this discussion, we have not stopped to inquire whether § 1 of the act was mandatory upon the county commissioners, or directory only, for the reason that, before the warrants upon which this action was brought were last presented for payment, the commissioners had in fact issued bonds under the act to the full amount of $30,000, and said bonds had been negotiated, and the proceeds thereof were in the treasury of the defendant county. But, upon a ground not heretofore mentioned, the learned counsel for respondent claims that there were certain legal warrants outstanding upon which the act could take effect. It is urged that, although not appealed from, yet the finding of the court that there was no levy in 1884 should be disregarded, as a matter not in issue, and contrary to the admissions in the pleadings. Let this be conceded *pro argumento*, and it will but strengthen our conviction. If the levy for 1884

was as high as the law permitted, the county revenue arising therefrom would be $7,718. To this add the sum of $2,303,—the revenue for 1883,—and we have a total for the two years of $10,021. As heretofore stated, the county had paid during said time $4,411.53, leaving a possible balance of $5,609.47 in valid, outstanding warrants. Under the authorities already cited, the presumption is conclusive here that the legislature knew that the outstanding warrants of Nelson County, valid and invalid, amounted to nearly $30,000. Did it authorize bonds in that sum for the purpose of paying less than one-fifth of the amount? To so hold compels us to say that the legislature did an unadvised, useless, and utterly incomprehensible thing. This the authorities sternly forbid. We are then forced to say that the legislature intended to provide for the payment of all outstanding warrants, or it intended to clothe the county commissioners with power to say what warrants should be paid and what should not. But the power to validate invalid evidences of municipal indebtedness is a purely legislative power, and cannot be delegated. If the act sought to throw such power into the hands of the county commissioners, it is unconstitutional and void. But, as between a construction that upholds and one that defeats the statute, the canons of construction leave us no choice. We must uphold the law. Further, how can we say that the legislative mandate to the treasurer to call in "all outstanding warrants" means "all such warrants as the county commissioners may direct?" The interpolation is wholly inadmissable. Let it be granted that certain outstanding warrants were valid. As to such warrants the first section of the act, while in form permissive, was in fact mandatory upon the board of county commissioners. Suth. St. Const. § 598; *Supervisors* v. *U. S.*, 4 Wall. 435; *People* v. *Board of Sup'rs of Niagara Co.*, 49 Hun. 32, 1 N. Y. Supp. 460; *People* v. *Sup'rs of Otsego Co.*, 51 N. Y. 401; *People* v. *Supervisors of Livingston Co.*, 68 N. Y. 114. But there is no discrimination in the act itself. All outstanding warrants are treated in the same manner, unless, indeed, it was the purpose to clothe the commissioners with

power to declare outstanding evidences of municipal indebtedness invalid. But that power is purely judicial, as the power to validate when invalid is purely legislative, and neither power can be exercised by a board of county commissioners. It would seem to follow that the act was entirely mandatory or entirely directory, and in our judgment it was mandatory. Had the act in terms validated all outstanding warrants, its mandatory character would not be questioned; but, if the warrants were validated by necessary implication, they were none the less valid, and the act not less mandatory. Viewing the action of the legislature in the light of the existing facts and circumstances conclusively presumed to have been known to the legislature, and the legislative purpose to validate and provide for the payment of all outstanding warrants cannot be doubted or evaded. Nor did that purpose work any injustice to the taxpayers of the defendant county. The county officials had incurred indebtedness for services, and in constructing roads, bridges, and improvements, far in excess of their legal powers. The county commissioners (the fiscal agents of the county) examined the bills and accounts, and declared them meritorious, and issued their warrants in payment therefor. The county had the benefit of the services and improvements. The moral obligation to pay was complete. The legislature added the legal obligation, but, instead of imposing the burden of payment on the infant county, it was extended through a long series of years, until, presumably, the financial condition of the county would be such that payment could be accomplished without hardship. Certainly, no fair minded taxpayer could object to such a course.

The learned trial court, as appears by its findings of fact and conclusions of law, decided this case exclusively upon the ground that the warrants upon which the action is based were void because issued in excess of the amounts of the current revenues of the years in which they were issued. We hold, upon grounds hereinbefore fully stated, that the act of March 13, 1885, cured that defect, and deprived the county of the defense of *ultra vires*.

The legislature had power to authorize the issue of warrants to the amount issued before they were issued, and hence it likewise possessed the power to subsequently ratify and validate those actually issued. If the county had any defense to the warrants on the merits,—such as a want of consideration to support them, or fraud in their issuance,—and such facts had been established at the trial, and found by the court, a very different question would have been presented to this court for determination. In the supposed case it would have devolved upon this court to decide whether the legislature could constitutionally legalize warrants issued fraudulently or without consideration, in whole or in part. There are no such findings in the record, and the legal presumptions are that the warrants were issued upon sufficient consideration, and without fraud. The sole ground upon which respondent endeavors, in this court, to uphold the action of the trial court, is that the warrants sued upon, and which appellant admits were originally *ultra vires*, were not validated by the subsequent legislative enactment. This ground failing, it follows that plaintiff is entitled to judgment for the full amount of such warrants. The trial court is directed to so modify its judgment as to award judgment in plaintiff's favor for the amounts prayed in the complaint. Appellant will recover costs in this court.

Modified and affirmed.

CORLISS, J., (dissenting.) The plaintiff sought to hold the defendant liable upon certain alleged county warrants. These instruments were county warrants in form, and it appears to be in the main undisputed, so far as this record is concerned, that these warrants were issued for debts incurred by the county. It is also uncontroverted that, in so far as the trial court refused to give judgment upon these warrants against the defendant, the warrants were originally illegal and void. The debts which they represented were obligations which the board of county commissioners had no authority to create, because the expenditures at the time were in excess of the amount which could be provided for by the

current revenue of the county from the tax levy of the year. It is unnecessary to refer to the statute or other authority which renders void these warrants representing such expenditures. The counsel for the plaintiff makes no contention against their original invalidity, but strenuously urges here that they have been transmuted into legal obligations of the county by an act of the legislature passed March 13, 1885, which provides as follows:

"An act to authorize the county commissioners of Nelson County, Dakota, to fund the outstanding indebtedness thereof.

"*Be it enacted by the legislative assembly of the Territory of Dakota*:

"SECTION 1. That the board of county commissioners of the County of Nelson, in the Territory of Dakota, be empowered, and are hereby authorized, to issue bonds for not less than five hundred (500) dollars each, the total amount of such issue not to exceed thirty thousand (30,000) dollars; said bonds to draw interest at a rate not to exceed eight (8) per cent. per annum, payable annually at the county treasurer's office of said Nelson County. Said bonds shall specify on their face the date, amount, for what purpose issued, the time and place of payment and rate of interest. Said bonds and coupons thereto attached shall be severally signed by the chairman of the board of county commissioners of said Nelson County, and attested by the clerk or auditor of said Nelson County; said bonds to be payable at the office of the county treasurer of Nelson County, or at such other place as the board of county commissioners may designate.

"SEC. 2. Said bonds shall be dated on the first day of July, A. D. 1885, and shall be payable in twenty (20) years, with the privilege of calling in said bonds at any time after ten (10) years.

"SEC. 3. The board of county commissioners of said Nelson County is hereby authorized, and it is made their duty to levy a sufficient tax for each year, besides the ordinary tax authorized by law, to be levied for the purpose of paying the interest of said bonds; *provided further*, that seven (7) years after the time of issue of said bonds, it is made the duty of said board of county commissioners to levy a sinking fund for the purpose of paying

off and redeeming said bonds, said tax not to exceed two (2) mills on the dollar of the valuation of said county in any one year.

"SEC. 4. It is hereby made the duty of the county treasurer of said Nelson County to negotiate the sale of said bonds, and to call in all outstanding county warrants whenever the bonds are sold, and he, said county treasurer, shall be allowed two (2) per cent. commission as his fees, and no more, for negotiating said bonds, and paying out said money; *provided further,* said bonds shall not be sold for less than par.

"SEC. 5. That after issuing the bonds mentioned in § 1 of this act, no warrants shall be issued by the county board unless at the time of issuing the same there is money enough in the county treasury of Nelson County to pay the warrants so issued.

"SEC. 6. This act shall take effect and be in force from and after its passage and approval.

"Approved March 13th, 1885."

At the outset we are informed by the title to the act, not that its purpose is to validate void county warrants, but to fund "the outstanding indebtedness" of the county. It is true that the title of a statute is not necessarily controlling; but something very convincing in the body of the act to the contrary of this avowed object of the law must be found, to overthrow this clearly expressed purpose merely to provide means for paying the outstanding indebtedness of the county. I find nothing to warrant me in construing this as a statute to validate void warrants, in that portion of the statute which makes it the duty of the county treasurer to sell the bonds, and call in all the "outstanding warrants." These words "outstanding warrants," are more naturally applicable to valid warrants than to void warrants. When we find them employed in a statute whose sole purpose, as disclosed by its title, is to fund the "outstanding indebtedness" of the county, is there any escape from the conclusion that they relate only to such warrants as represent county indebtedness? In no proper sense is a paper in the form of a county warrant, but issued without authority, and against the

commands of a statute, an indebtedness of the county. It is urged, however, that if only valid warrants were to be provided for there was no occasion for the enactment of the statute, as all such warrants would be paid out of the annual revenue. But it is well known that, while in theory the revenue from taxation should equal the total tax levied, yet in practice it often falls short of it, because of the failure to collect all taxes due. Sales of property to enforce collection will not bring cash to the treasury when no purchasers can be found. Because of inability to obtain cash for taxes, it might well happen that it would be necessary to provide another mode of payment for valid county warrants. In some of the counties, (and Nelson County was not more fortunate than other counties,) many farmers found themselves unable, through repeated crop failures, to pay their taxes. Nor does it necessarily follow that, because all legal warrants would be paid out of current revenues if the affairs of the county were lawfully managed, the legislature was bound to assume that all of them had been so paid. It might easily happen that the county treasurer would pay the warrants in their numerical order, and in this way the illegal warrants of one year might be paid out of the revenue of the next year; completely exhausting such revenue, and leaving the valid warrants of that year entirely unprovided for. It is not utterly impossible for it to have been a fact that very few of the legal warrants of either year had been paid at the time the act in question was passed. The revenues of these years might have been improperly spent. Valid warrants to the amount of over $10,000 could have been issued during these two years. It seems to me an extraordinary doctrine that the legislature inquired whether a strictly legal levy had been made during the year 1884 before passing this law. Nor is it important whether they made such inquiry or not. It is not controverted that there were some steps taken towards a legal levy. If the power of a county to incur debts depends upon their being in fact a valid tax levy for the county,—if the validity of tax proceedings are indispensible,—then very few valid warrants, in such cases, have been

issued.  The county may contract an indebtedness equal to the amount of taxes it can collect during the year, on the theory that the taxes are legal.  Whether the taxes are legal or not is entirely immaterial, provided there are some  steps taken towards the levy of a tax.

The prevailing opinion in this case, in assuming that there were no valid warrants outstanding at the time of the passage of this act, assumes a fact which I am unable to find in this record.    I know it was possible for there to have been valid warrants outstanding at that time, for the reasons already stated, and it appears from this record that such was the fact.  The court expressly finds that at the time the act was passed only $4,411.53 of over $32,000 of warrants had been paid.  As valid warrants to the amount of over $10,000 might have been issued during the years 1883 and 1884, how can it be said that the legislature was bound to know that all of these unpaid warrants were void, when over $5,000 of them might have been valid?    But what I regard as a conclusive argument against this reasoning is that it embodies still another unwarranted assumption.   It assumes that the legislature was as fully in possession of all the facts regarding the illegality of these warrants as this court, after careful judicial investigation.   This assumption is unreasonable, because it nowhere appears upon the face of the bill that the question whether these warrants were illegal was called to the attention of the legislature, or was in their minds, when the act in question was passed.   This act does not pretend to legalize illegal warrants, or to deal with them in any way.  On the contrary, its provisions relate to such warrants as constitute indebtedness of the county, *i. e.* valid warrants.  When the legislature was asked to pass a law to fund the outstanding indebtedness of the county, and was informed that there were warrants outstanding to about the amount of $30,000, there was nothing in the circumstances of the case, or in the nature of the legislation asked at their hands, to call their attention to the question whether these warrants were

illegal, or to lead to an investigation of the matter. They were
merely asked to give the county authority to fund such of them
as constituted indebtedness of the county, not exceeding $30,000.
They did not give power to fund $30,000 of warrants and
pretended warrants. It is only on the theory that they are
presumed to have made a careful investigation of this question,
which was not before them, so far as this act shows, that it can be
said that they intended to legalize void warrants on the ground
stated in the prevailing opinion, that it was only for void warrants
that such funding measure was necessary. If they did not make
such investigation, they knew nothing of the validity or invalidity
of the warrants. To support the contention that the legislature
investigated the question of their legality, it is necessary to
assume, in the first instance, that the act relates to illegal as well
as valid warrants. This is the very question to be determined.
It is hardly logical to assume it in order to prove it. It is a
rational assumption that they took it for granted that these
alleged warrants which were outstanding were valid warrants,
there being nothing in the statute to raise the question of invali-
dity, and the act being limited to valid warrants. The absence of
all language showing a purpose to legalize the warrants is to my
mind conclusive that the question of their illegality was not before
them, and had not occurred to them. It would have been easy
to have expressed such a purpose, had such been the legislative
will. Whenever the legislature has wished to legalize county
warrants, they have not found it difficult to express this purpose
in unmistakable language. In one instance we find the contrast
sharply presented between the funding of outstanding indebted-
ness and the legalizing of county warrants. The tittle of an act
passed in 1881 is "An act authorizing the board of commissioners
of Hutchinson County to fund certain outstanding indebtedness
and legalizing warrants issued by the commissioners of Armstrong
County." The act declares "that the board of commissioners of
Hutchinson County are hereby authorized to fund such indebted-
ness of said county as may exist on the first day of March, 1881,

and also to fund the outstanding warrants issued by authority of the commissioners of Armstrong County prior to the date of the delivery of the books of said Armstrong County to the officers of said Hutchinson County, which warrants issued in the regular order of business of said acting commissioners of Armstrong County are hereby legalized." Laws 1881, Ch. 16. The act in question in this case embraces only the funding feature. It does not also "legalize" the warrants. Power to incur indebtedness binding upon a municipal corporation must be clearly conferred. No doubtful implication will suffice. Shall the act which is to ratify an illegal exercise of authority be less explicit?

I regard it as a dangerous doctrine that after extravagance has issued pretended obligations of a municipality in excess of authority, and in the very face of statutory prohibition, cunning can outwit the wise and salutory restrictions upon municipal expenditures, by concealing, in artfully framed statutes, its purpose to legalize the void obligations, and then secure from the courts a construction of the law which the language of the act not only did not reveal, but studiously buried from sight. When a bill is introduced to legalize void indebtedness, it must disclose its purpose upon its face, to the end that every legislator may act intelligently,—may meet that issue upon its merits. A court which, after a measure, whose real purpose to legalize is concealed by its author from the legislature, has skulked through the legislative halls in the disguise of ambiguous and doubtful language, aids in throwing off the cloak of deception, will find that it has encouraged like practices in the future. I do not say that deception was in the mind of the one who framed this statute. But I venture the prediction that practically every member who voted for it will be dumfounded at finding such radical consequences wrapped up in this simple funding law. Whatever rule may elsewhere obtain, in my judgment, we should lay down as a rule to be rigidly enforced that the purpose to validate a void obligation must be expressly declared, or be deduced from the law by the clearest necessary implication. The case of *Brown*

v. *Mayor*, 63 N. Y. 239, is one in which the purpose to validate was necessarily embraced in the act. In that case the commissioner of public works had entered into a contract with plaintiff "for regulating, grading and setting curb and gutter stone in Tenth avenue from Manhattan to 155th street, and flagging the sidewalks thereof." The contract was held void because it was not founded upon sealed proposals, and was not let to the lowest bidder after advertisement, as required by the statute. The court, however, held that the contract had been validated by a subsequent act of the legislature, which provided as follows: "The board of the assessors of the City of New York are hereby authorized and directed to assess upon the property intended to be benefited, in the manner provided by law for making assessments for local improvements, the expense which has been, or shall be actually incurred by the mayor, aldermen and commonalty of the City of New York for regulating, grading and setting curb and gutter stones and flagging the sidewalks in the Eighth avenue, from Fifty-Ninth street to One Hundred and Twenty-Second street, in said city; also in the Tenth avenue, from Manhattan street to One Hundred and Fifty-Fifth street in said city." The law required all expense connected with this particular work, whether incurred or to be incurred, to be assessed upon the property benefited by the improvement. Here was a legislative declaration that the amount of expenses already incurred and to be incurred under any contract relating to the improvement to these parts of streets should be raised by assessments upon the property benefited. The money so raised was clearly intended to be used in paying these expenses, and this would involve payment of the expenses under the void contract. I do not wish to be regarded as expressing my approval of this case. I think the doctrine that a void claim against a municipality can be legalized by anything short of a very clear manifestation of such purpose is fraught with danger, —is repugnant to sound policy. Let it once be understood that the courts demand an unequivocal expression of the purpose to

validate the void obligation, and there will be found no difficulty in so framing statutes as to express this purpose in unmistakable language. Let the contrary rule prevail, and funding statutes will become the stalking horses to cover the secret wish of interested parties to secure the legitimation of void debts, when it would not be safe to reveal such purpose to the legislature; and, to the surprise of legislators, the innocent funding bill for which they voted will be found to be a wide reaching and radical measure, to create, and not merely to fund, legal obligations.

The case of *Beloit* v. *Morgan*, 7 Wall. 619, which is relied upon by plaintiff's counsel, is, in my judgment, distinguishable from the case at bar. The town of Beloit have issued certain bonds in payment for railroad stock, which were void, the legislature created out of a portion of the territory embraced within the limits of such town the City of Beloit. No other bonds had at that time been issued for railroad stock by the town of Beloit, except those already referred to. Under these circumstances the legislature declared that "all principal and interest upon all bonds which have heretofore been issued by the town of Beloit for railroad stock or other purposes, when the same, or any portion thereof shall fall due, shall be paid by the town and City of Beloit in the same proportions as if said town and city were not dissolved." The court laid stress on the fact that the act could have no effect, as to bonds issued for railroad stock, unless it was held to apply to those void bonds, as they were the only bonds which had been issued for that purpose by the town, and that the act declared that such bonds should be paid. Said the court: "No bonds were issued in payment for railroad stock, but those to a part of which this controversy relates. The language used by the legislature is clear and explicit. No gloss can raise a doubt as to its meaning. It distinctly affirms, and the affirmation is repeated, that the bonds shall be paid." The more recent decision of the Federal Supreme Court fully sustains my conclusion. *Hayes* v. *Holly Springs*, 114 U. S. 120, 5 Sup. Ct. 785. The facts of that case are as follows: The constitution of Mississippi

declared that the legislature should not authorize any county, city, or town to become a stockholder in, or to lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a special election or regular election to be held therein, should assent thereto. A city in that state subscribed for stock in the Selma, Marion & Memphis Railroad Company, after an election held to vote on that question, but neither the election nor the subscription was authorized by the legislature. There being a vote of more than two-thirds in favor of the proposition to subscribe for the stock, the subscription was made, and bonds to pay for the stock were issued   They were, of course, void.   But subsequently the legislature passed an act which declared that "all subscriptions to the capital stock of the said Selma, Marion & Memphis Railroad Company, made by any county, city or town of this state, which were not made in violation of the constitution of this state, are hereby legalized, ratified and confirmed." Laws 1872, Ch. 75, p. 313. This act more strongly indicates a purpose to validate the void subscription and bond than does the act relied on in this case indicate a purpose to legalize void warrants; and yet the court was clearly of the opinion that it had no such effect, and there was no dissent in the case.   Counsel for plaintiff seeks to distinguish this case on the ground that the legalizing statute was not applicable to the subscriptions and bonds in question, for the reason that it validated only such subscriptions as were not made in violation of the constitution.   This reasoning of the counsel assumes that the subscription in question did violate the constitution.   But it did not.   The subscription was not void because the constitution prohibited it, but because there was no statute authorizing it.   The case was one of a want of power, and not of the violation of the fundamental law.   The subscription was such a one as the constitution permitted the legislature to authorize. The only trouble with it was that the legislature had failed to authorize it.   The case was in no manner different from what it would have been, had the constitution been silent on the subject,

and there had been no statute authorizing the subscription; and yet, in such a case, it would not be pretended that the subscription would have been in violation of the constitution. The constitution merely restricted the legislature in the exercise of its power to authorize such subscriptions, and is it only with reference to such subscriptions as the legislature were prohibited from authorizing that it could be said that the subscription would be in violation of the constitution. But the subscription made was one which the legislature might have authorized. The following language of the court in that case embodies my conception of the true doctrine: "The intention of the legislature to confirm and ratify the subscription in question cannot be ascertained with certainty from the language of the act, which is too vague to form the basis of so important an authority as that sought to be deduced from it. As is said in *State v. Stoll*, 17 Wall. 425, 436, if the legislature intended to do what is claimed, 'it was bound to do it openly, intelligibly, and in language not to be misunderstood;' and, 'as a doubtful or obscure declaration would not be justifiable, so it is not to be imputed.'"

The argument that the legislature should not be presumed to have passed an idle act has but little weight, under the circumstances of this case. There might have been several thousand dollars of valid warrants outstanding when the acts was passed. I believe that there were. If so, the act would have force when construed as a mere funding law. The legislature does not declare that the county shall bond to the amount of $30,000. It says that this shall be the limit. Whatever amount, under this sum, shall be needed to pay warrants, may be raised by the issue of bonds. Suppose that the legislature had said in terms that only valid warrants should be paid. Would it be argued that illegal warrants must be paid because to hold otherwise would render the act of no effect? Had the statute in terms spoken of valid warrants, it would not have been clearer. We have seen that the legislature knew what language to employ when they desired to legalize void warrants. They used explicit language in such a

case, but in this act, they refrain from the use of such language, and expressly limit the law to valid warrants by describing it as a law to fund the indebtedness of the county. It seems to me that the fallacy of the reasoning that the legislature must be presumed to have known all the facts is two-fold: Their attention was not called by the prepared bill to any matters connected with the validity of these warrants, and we have no means of knowing that they had evidence that all of these warrants were void. We do not know it ourselves. There is nothing in the language of the cases cited in the prevailing opinion warranting the rule that this court must assume that the legislature had investigated a mass of facts which were entirely foreign to the measure they were about to pass,—a measure to provide for the funding of the county indebtedness by the issue of bonds to the necessary amount, not exceeding $30,000. I know of no decision which holds that the legislature must be presumed to have investigated facts not suggested by a bill before them, for the purpose of forcing into the act, by a strained construction, a meaning not apparent on the face of the act itself,—a meaning directly opposed to the terms of the statute; a meaning which finds no support, except upon the theory that the legislature, without any hint as to their relevancy from the act itself, have examined into these facts. What right have we to say that such an investigation, even if made, convinced the legislature that there were nothing but void warrants to be funded? It is said that the provision requiring the treasurer to call in all outstanding warrants, etc., is conclusive that void warrants were intended to be legalized. But the treasurer is not directed to call in pretended warrants. He has no power or right to do so. The instruments he is to call in are warrants, and warrants are instruments which represent the indebtedness of some municipality; and he is distinctly informed that it is only warrants of that kind —only real warrants, and not *pseudo* warrants—that he is to pay, by the very title of the act, which speaks of the funding of the indebtedness as being the sole purpose of the statute. It cannot

be said that to hold that the county commissioners were to pay only valid warrants out of the proceeds of the bonds sold would vest them with judicial power. Not at all. They were not to determine this question finally. Should they refuse to pay a valid warrant, they could be compelled to pay it. Should they undertake to pay a void warrant, they could be restrained from doing so. They would merely determine, as the officers of any other corporation would determine, what were valid claims against the corporation. No one ever dreamed that the decision of such a question as the basis of business action was the exercise of judicial power. It is a decision that is being made thousands of times every day by business men, when asked to pay some claim or some pretended obligation. They do not decide it finally. They merely decide it for the purpose of governing their conduct in paying or refusing to pay the claim presented. So with reference to these outstanding warrants. The county commissioners could not finally determine which were to be paid and which were not to be paid. They could only decide the matter as other business men decide similar questions, in determining whether they will pay a claim or contest it in the courts.

The statute, upon its face, is simply a funding law. Nothing else can be made of it, unless extrinsic circumstances are to be considered. Now, there is no rule better settled than that which forbids an examination of extrinsic facts,—which prohibits an inquiry as to consequences when the act, upon its face is unambiguous. Courts look to consequences, and investigate circumstances, not to introduce doubt and uncertainty into an act, the meaning of which is plain upon its face, but to aid in solving doubts which the very terms of the act itself create. When the legislature has passed a statute which in terms is clearly a mere funding law, what right have we to construe it as a legalizing statute because investigation may lead us to the conclusion that the outstanding legal warrants against the county were less in amount than the sum for which the county might issue its bonds to fund its indebtedness? What right have we, at all, to look beyond the

language of the act itself? For my part, I believe we have no right to fix the judicial eye upon anything but the words of the plain statute itself. The rule which I invoke is ancient, and it is universally recognized. "If the meaning of statutes is doubtful, the consequences are to be considered in the construction of them; but, if the meaning is plain, no consequences are to be regarded, for that would be assuming legislative authority." 4 Bac. Abr. 652. See *Coffin* v. *Rich*, 45 Me. 507. The court said: "It is only when the words of the statute are obscure or doubtful that we have any discretionary power in giving them a construction, or can take into consideration the consequences of any particular interpretation." In *Salling* v. *McKinney*, 1 Leigh, 42, the court said: "In the construction of statutes, we are told, from high authority, that, when the words are doubtful and uncertain, it is proper to inquire what was the intent of the legislature, but, where they have expressed themselves in plain and clear words, it is very dangerous for judges to launch out too far, in searching into their intent." In *Hoke* v. *Henderson*, 4 Dev. 1, it is held that "in construing a statute, if the words are ambiguous, resort should be had to the probable consequences which would arise from the one or the other construction; but, if the meaning of the language of the statute is plain, there can be no such reason." In *U. S.* v. *The Sadie*, 41 Fed. 396, the court said, (quoting with approval the language of the court in *U. S.* v. *Rector, etc., of Church of Holy Trinity*, 36 Fed. 304:) "Where the terms of the statute are plain, unambiguous, and explicit, the courts are not at liberty to go outside of the language, to search for a meaning which it does not reasonably bear, in the effort to ascertain and give effect to what may be imagined to have been the intention of congress." Mr. Sutherland says, in his work on Statutory Construction: "And, if the legislature has expressed its intention in the law itself, it is not admissable to depart from that intention on any extraneous consideration or theory of construction. Very strong expressions have been used by the courts to emphasize the principle that they are to derive their knowledge of the legislative

intention from the words or language of the statute itself, which the legislature has used to express it, if a knowledge of it can be so derived." Section 236, p. 312. He says further, in § 237, on p. 312: "It is, beyond question, the duty of courts, in construing statutes, to give effect to the intent of the lawmaking power, and seek for that intent in every legitimate way, but * * * first of all in the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation. The statute itself furnishes the best means of its own exposition, and, if the sense in which words were intended to be used can be clearly ascertained from its parts and provisions, the intention thus indicated will prevail, without resorting to other means in aiding in the construction." Again on p. 313, he says: "The legislative intent being plainly expressed, so that the act, read by itself, or in connection with other statutes pertaining to the same subject, is clear, certain, and unambiguous, the courts have only the simple and obvious duty to enforce the law according to its terms." In *Alexander* v. *Worthington*, 5 Md. 485, the court said: "The language of a statute is its most rational exposition, and, where its language is susceptible of sensible interpretation, it is not to be controlled by any extraneous considerations."

In conclusion, I wish to express my pleasure that the majority of this court are able to reach a conclusion contrary to this opinion, and hold the county liable on these warrants. To a new state, its financial honor is of the highest importance. To develop its resorces, capital is indispensable, and every thing that savors of repudiation, in any form, tends to frighten capital from its borders.